Receipt #04-10

ORIGINAL

FILED
JUL 1 3 2004
U.S. COURT OF FEDERAL CLAIMS

ECF

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LESLIE T. GLADSTONE, AS TRUSTEE OF THE WILLIAM G. TADLOCK, INC. BANKRUPTCY ESTATE, | ) | |
| Plaintiff, | ) | Case No. 04-1144C |
| vs. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## COMPLAINT

1. Plaintiff Leslie T. Gladstone, as Trustee of the William G. Tadlock, Inc. Bankruptcy Estate ("Trustee") brings this action to recover damages incurred from a breach by the United States Government of a contract entered into with the United States Government for the rehabilitation of two enlisted forces barracks at the Marine Corps Base, Camp Pendleton, California.

## JURISDICTION

2. Trustee's claims arise under Section 10(a)(1) of the Contract Disputes Act of 1978, 41 U.S.C. Section 609(a)(1). This court has jurisdiction over such claims under 28 U.S.C. Section 1491(a)(1) and (2).

3. Trustee has a valid Claim, as described below, because:

   1. Trustee's predecessor, William G. Tadlock, Inc., ("Tadlock") submitted a written demand to the Government ("Claim"), which demand was reiterated by the Trustee through the Trustee's counsel;

   2. Initially Tadlock, and now the Trustee, are entitled to receive a response to their Request for Contracting Officer's Final Decision on their Claim, as a matter of right;

3. The Claim demands payment of a sum certain; and

4. By virtue of the Contract Officer's failure to render a final decision on that Claim within sixty days of service of that Claim, the Claim is deemed rejected.

## PARTIES

3. Trustee is the Trustee in the matter *In re W.G. Tadlock & Company,* Bankruptcy Case No. 01-10104-A7 pursuant to the Order of the United States Bankruptcy Court, Southern District of California on or about March 13, 2002.

4. Defendant is the UNITED STATES OF AMERICA ("Government"), acting through the Department of the Navy, Southwest Division, Naval Facilities Engineering Command (1220 Pacific Highway, San Diego, California 92132-5190).

## FACTUAL BACKGROUND

5. On April 11, 1996, the Government issued a sealed bid solicitation, Solicitation Number N68711-94-B-0152 for the rehabilitation of two enlisted forces barracks at the Marine Corps Base, Camp Pendleton, California (the "Project"). These barracks were identified as Building 22206 and Building 22207.

6. On May 14, 1996, Tadlock, a general contractor and construction company, submitted a bid to remodel those barracks for the fixed price of $4,268,896.00 (the "Contract Price").

7. On June 1, 1996, the Government accepted Tadlock's bid. A written contract was thus formed between Tadlock and the Government whereunder Tadlock would perform the refurbishment according to detailed plans and specifications for the not-to-exceed contract amount of $4,268,896.00 (the "Contract"). The Government's consideration for the Contract was to be paid to Tadlock in progress payments, as the rehabilitation work progressed.

8. Pursuant to the Government's acceptance, the refurbishment was to be completed in 543 calendar days (the "Contract Performance Period").

9. On August 12, 1996, Tadlock submitted a Progress Schedule to the Government, setting forth its anticipated construction schedule for the Project.

10. On September 9, 1996, the Government approved Tadlock's Project Schedule as to general sufficiency for planning and control, subject to compliance with the detailed requirements set forth in the detailed plans and specifications, and architectural and other drawings provided by the Government for completion of the Project (the "Contract Documents").

11. From almost the beginning, problems and obstacles were encountered. On October 7, 1996, the Government issued a Suspension of Work Notice to correct structural defects and limitations discovered in the beginning of the rehabilitation process, specifically structural problems involving the grade beam foundation on both buildings and repair of the walls at the central stairways in Building 22206.

12. On November 20, 1996, the Suspension of Work Notice was extended 45 days pending resolution of the structural problems.

13. On December 9, 1996, the Government proposed detailed changes set forth in Prime Cover No. 000001, specifically revisions or corrections to the structural work involving the grade B foundation for both buildings 22206 and 22207, and repair of the walls in building 22206.

14. On January 6, 1997, the Suspension of Work Notice was extended yet an additional 45 days.

15. On February 18, 1997, the Suspension of Work Notice was again extended an additional 45 days.

16. Tadlock and the Government met at a negotiation meeting on March 20, 1997, at which they reached a tentative resolution of their dispute resulting from the structural problems involving the Grade B foundation at buildings 22206 and 22207, and the repair of the walls at the central stairways in building 22206 which had resulted in the issuance of four partial suspension of work notices.

17. On March 25, 1997, Tadlock submitted a proposal encaptioned "Time," through which

Tadlock requested from the Government a total compensation of $184,706.11 calculated from 180 calendar days of delay due to defective plans and specifications.

18. On March 25, 1997, and in a letter memorializing revisions of both Prime Cover No. 1 and Time, Tadlock requested the total amount of $379,461.00, which is the result of combining the amount set forth in Prime Cover No. 1 and Time for delays and disruptions arising out of, or incidental to, the Project as of April 3, 1997.

19. Additionally, on March 26, 1997, counsel for Tadlock submitted legal authority to the Government identifying Tadlock's right to be awarded compensation for delay caused by "defective specifications," to support both the claims set forth in Prime Cover No. 1, and the Time proposal.

20. Finally, at a negotiation session on March 27, 1997, Tadlock and the Government mutually agreed to a revised Contract Price and a time extension to resolve the impediments caused by those structural defects.

21. As a result of a modification to the Contract agreed to pursuant to those negotiations, Modification to Contract Number A00001, the total Contract Price was increased by $367,526.00, from $4,268,896.00 to $4,636,422.00. The Contract Performance Period was also extended by 214 calendar days, from December 31, 1997 to August 2, 1998. These amounts included 172 days of delay time and 42 days' overhead for resolution of the structural defects.

22. On May 14, 1997, Tadlock and the Government entered into another modification to the Contract, Modification to Contract Number A00002, whereby the Contract Price was increased by $384,733.00, from $4,636,422.00 to $5,021,155.00, in exchange for replacement of deteriorated studs, installation of additional piping for hot water tanks, and removal and replacement of electrical conduit. The Contract Performance Period was extended by 60 calendar days from August 2, 1998 to October 1, 1998.

23. On August 7, 1997, the Government issued a Suspension of Work Notice as to work being

performed on Building 22207.

24. On September 10, 1997, Tadlock and the Government entered into another modification of the Contract, Modification to Contract Number A00003, increasing the total Contract Price by $16,038.00, from $5,021,155.00 to $5,037,193.00, in exchange for replacement of hose bibbs and piping. The Contract Performance Period remained unchanged.

25. On September 10, 1997, Tadlock and the Government entered into another modification of the Contract, Modification to Contract Number A00004, whereby the Contract Price was increased by $92,328.00 from $5,037,193.00 to $5,129,521.00, in exchange for various revisions to the roof construction for building 22206. The Contract Performance Period was extended by 45 calendar days from October 1, 1998 to November 15, 1998.

26. On September 18, 1997, Tadlock and the Government entered into another modification of the Contract, Modification to Contract Number A00005, whereby the total Contract Price was decreased by $13,552.00, from $5,129,521.00 to $5,115,969.00, in exchange for adjustments to the fire alarm data gathering panels in both buildings. The Contract Performance Period remained unchanged.

27. On September 30, 1997, Tadlock executed another proposed modification to the Contract, Modification to Contract Number A00006, to increase the Contract Price by $63,922.00 from $5,115,969.00 to $5,179,891.00, in exchange for installation of new conduit for exterior light fixtures, upgrade of the water pressure regulator for Building 22206, installation of back flow preventers in the cold water supply for each building, and upgrades for the fire protection system for Building 22206. The Contract Performance Period was proposed to be left unchanged. The Government never signed Modification to Contract Number A00006.

28. Instead, on February 26, 1998, through another proposed modification to the Contract, Modification to Contract Number A00007, the Government issued to Tadlock a Notice of Partial

Contract Termination for the Convenience of the Government, in accordance with Federal Acquisition Regulation ("FAR") Clause 52.249-2 for cessation of work on Building 22207 under the Contract (the "Termination for Convenience"). Contract work on Building 22207 was currently under the suspension of work dated August 7, 1997. The Termination for Convenience ordered Tadlock to cease work on Building 22207, notify its immediate subcontractors of the cessation of work, keep records of that notification, notify the Government's Contracting Officer of all pending legal proceedings, deliver to the Government all termination inventory for Building 22207 and settle its disputes with subcontractors, if any. Tadlock did not sign Modification to Contract Number A00007. Work on Building 22206 was substantially complete.

29. Significant termination expenses were anticipated to enable Tadlock to cease operation on the refurbishment of Building 22207, to dispose of or reassign inventory, generally to wind down and to dismember operations for the entire Project, and to perform other tasks necessitated for effecting the Termination for Convenience. Tadlock and the Government therefore entered into negotiations, which resulted in a number of further modifications to the Contract.

30. As part of the settlement, Tadlock and the Government entered into another modification of the Contract on March 5, 1998, Modification to Contract Number A00008, wherein the Contract Price was increased by $5,407.00 from $5,179,891.00 to $5,185,298.00, in exchange for modification to the installation of plumbing fixtures, less a credit for retaining and reusing existing wiring for exterior light fixtures.

31. On March 6, 1998, the Government issued a proposed further modification to the Contract, Modification to Contract Number A00009, unilaterally reducing the contract price by $600,000.00, to release purported excess funds generated from the Termination for Convenience initiated by the Government. Tadlock did not sign Modification to Contract Number A00009 but did send copies to all the subcontractors who were involved.

32. On March 20, 1998, Tadlock and the Government entered into a further modification of the Contract, Modification to Contract No. A00010, wherein the total contract price was increased by $48,723.00 from $4,585,298.00 to $4,634,021.00, in exchange for sealing the first floor slab in building 22206 to reduce moisture permeation prior to installation of vinyl tile. The Contract Performance Period was deemed to be unchanged.

33. On March 27, 1998, Tadlock returned the proposed unilateral Modification to Contract No. A00009 to the Government unsigned, because it was called a unilateral modification but was written as a bilateral modification, and Tadlock estimated that the excess funds that would be left over after negotiation of the Termination for Convenience would be $450,000.00. Tadlock believed that if the Government de-obligated more funds than would be required to reach a fair and equitable settlement, the Government would have to seek and obtain further funding which could stall the resolution process for several more months.

34. On April 9, 1998, the Government proposed Modification to Contract Number A00011 for administrative purposes. Tadlock did not sign Modification to Contract Number A00011.

35. On April 14, 1998, Tadlock and the Government entered into Modification to Contract Number A00012, whereby the total contract price was increased by the not-to-exceed amount of $300,000.00, from $4,634,021.00 to $4,934,021.00 in exchange for various repairs and replacements of concrete, repair of columns, demolition and repair of corroded expansion joints and replacing coating on columns. Pursuant to Modification to Contract Number A00011, the final value for the work was subject only to downward adjustment as a result of negotiations. The contract completion date of November 15, 1998 remained unchanged.

36. On April 21, 1998, Terry Riggs of Tadlock, Tadlock's Chief of Quality Control, and Renae Jones of the Government had a contentious telephone conversation in which Mr. Riggs explained that Tadlock was entitled to recoup the rental value of its equipment on a daily cost basis and not by

the actual hours the equipment was used. Ms. Jones suggested that the daily method would result in a dishonest overcharge to the Government. Mr. Riggs suggested removing Tadlock's equipment and replacing it with rental equipment, to which Ms. Jones agreed.

37. During a meeting on April 27, 1998 and multiple subsequent telephone conversations, Tadlock and the Government reached tentative resolution of certain disputed issues arising from the Termination for Convenience. The terms resolved are set forth in correspondence dated May 15, 1998 from John N. Starcher, the Terminating Contracting Officer for the Government, to Mr. William G. Tadlock, Inc., the president of Tadlock. These issues included labor required for disposal or reassignment of inventories remaining as a result of the Termination for Convenience, storage arrangements for that inventory, the administrative process to be used in the approval and settlement of subcontract proposals, and a request for partial payment for work performed pursuant to the Termination for Convenience.

38. On May 21, 1998, Tadlock requested that the equitable adjustment time period for resolution of disputes arising out of the termination for convenience be extended an additional ninety days.

39. On May 27, 1998, the Government agreed to extend the equitable adjustment time period through August 28, 1998.

40. On June 1, 1998, Tadlock requested an extension of time to submit the inventory schedule required by the Termination for Convenience to 120 days from the written direction for the inventory or from June 26, 1998 to September 25, 1998.

41. On June 8, 1998, the Government agreed only to extend the deadline for submission of the inventory schedule for thirty days, or until July 26, 1998.

42. On July 9, 1998, the Government notified Tadlock that no further partial payment would be made for costs associated with the termination for convenience until Tadlock submitted its settlement proposal for issues arising from the Termination for Convenience.

43. Additionally, on August 3, 1998, Tadlock and the Government met to discuss issues involved in preparation of Tadlock's settlement proposal, Tadlock's request for an equitable adjustment as compared to a consolidated settlement proposal, title and status and/or disposal of inventory and partial payments of costs incurred.

44. Tadlock, its counsel, its accountants and the Government had a further meeting on August 12, 1998 to discuss issues involved with Tadlock's preparation of a settlement proposal for the Termination for Convenience.

45. Tadlock submitted its inventory schedules to the Government on July 26, 1998 but without prices. The Government notified Tadlock that prices were required. Accordingly, on August 27, 1998, Tadlock requested a further sixty-day extension for submission of the request for equitable adjustment and inventory in order to obtain pricing information on the inventory from applicable subcontractors and vendors. The Government extended the due date for Tadlock's submission of inventory schedules for sixty days, until October 27, 1998.

46. On August 28, 1998, the Government submitted twenty-seven separate requests for further detail arising from completion of Prime Cover No. 22. (Prime Cover No. 22 had been initially issued by the Government on January 28, 1998 and had been authorized by the Government for completion by Tadlock through modification to Contract No. 00012, which was executed by the Government and Tadlock on April 14, 1998.)

47. On September 3, 1998, Tadlock and the Government met again to discuss identification and calculation of costs, equitable adjustment as compared to a consolidated settlement proposal, status, disposal and storage of inventory, and partial payment based on interim proposal.

48. On September 23, 1998, the Government agreed in writing to accept reasonable estimates for assigning costs to the items on the inventory schedule.

49. On October 13, 1998, Tadlock and the Government entered into Modification to Contract

Number A00013 wherein the total contract price was decreased by $642.00 from $4,934,021.00 to $4,933,379.00 due to substitution of three-sixteenth inch thick glass shower doors for the specified one-quarter inch thick glass shower doors.

50. By December 18, 1998, Tadlock had completed a draft inventory schedule with prices.

51. On February 26, 1999, Tadlock submitted its final Termination for Convenience Proposal to the Government in the amount of $1,184,851.00 ("Proposal") by certified mail. Tadlock retained accountants to calculate the amount owing as a result of the Termination for Convenience and submitted a report prepared by those accountants with its February 26, 1999 Proposal.

52. In a calculation issued on August 26, 1999, Tadlock calculated that it had incurred expenditures in the amount of $5,600,939.35, but had received payments from the government of $3,944,914.00. Thus, according to this August 26, 1999 calculation, Tadlock evaluated its compensatory damages caused by the Government's issuance of the Termination for Convenience to be $1,062,025.35.

53. Negotiations were conducted between representatives of the Government and Tadlock on April 2, 1999, June 8, 1999, June 15, 1999, and July 30, 1999. To facilitate these negotiation sessions, and in a voluminous transmittal sent to the Government on August 27, 1999, Tadlock supplemented its Proposal by submitting to the Government backup information and documentation to supplement its Termination for Convenience Claim.

54. Further negotiations between the Government and Tadlock ensued on September 2, 1999, November 10, 1999, November 16, 1999 and November 19, 1999. The Government and Tadlock failed to reach any agreement through these negotiations.

55. Pursuant to Federal Acquisition Regulation ("FAR") definition clause, Part 49.001, Tadlock utilized the "total cost basis" method for calculating its Proposal in response to the Termination for Convenience. Tadlock justified that practice in correspondence dated January 14, 2000. The

Government had requested that Tadlock use the "inventory method" for pricing its proposal, which Tadlock explained was inappropriate under the Government's own rules.

56. Tadlock also reported the value of equipment use as the going rental rate times the actual hours used, to which the Government objected.

57. Further negotiations between Tadlock and the Government ensued. The Government and Tadlock failed to reach any agreement.

58. The Government prepared an audit, and issued Audit Report No. 4151-2000A17100001 on March 10, 2000.

59. Tadlock made an offer to compromise in the amount of $725,953, and, at a meeting on July 27, 2000, the Government made a counter-offer of $56,654.00 which it further reiterated in correspondence dated July 28, 2000.

60. Based on information and belief, the Trustee alleges that the audit report presented to Tadlock by the Government at the July 27, 2000 meeting, upon which the Government premised its counteroffer, was prepared to reflect the settlement amount which the Government wished to pay, as opposed to being the actual report prepared and filed by the auditor who had been assigned to prepare the audit by the Defense Contract Audit Agency.

61. In correspondence dated November 21, 2000, Tadlock responded with a counter-offer for $701,110.00, which was not accepted by the Government.

62. Instead of continuing negotiations, the Government responded on December 8, 2000 by demanding further documents and information. In its response, the Government stated that further negotiations would be pointless if these were not provided.

63. Based on information and belief, the Trustee alleges that the documents demanded by the Government in its December 8, 2000 correspondence had either been previously provided to the Government by Tadlock , or were irrelevant to the issues being negotiated between Tadlock and the

Government.

64. On July 31, 2001, Tadlock filed a petition for bankruptcy under Chapter 11.

65. Ultimately, on January 31, 2002 Tadlock prepared a Final Claim Computation for $598,273.49, which it served upon the Government on February 5, 2002 as a Certified Claim.

66. Accompanying service of Tadlock's Final Claim Computation and Certified Claim dated February 5, 2002, Tadlock served upon the Government a formal Request for Contracting Officer's Final Decision concerning Tadlock's Certified Claim in accordance with the Disputes Clause of the Contract and the Contract Disputes Act of 1978 as amended.

67. On March 13, 2002, Tadlock's bankruptcy petition was converted to a Chapter 7 proceeding and plaintiff Leslie T. Gladstone was appointed Trustee of the William G. Tadlock, Inc. Bankruptcy Estate (the "Estate").

68. Tadlock's Certified Claim therefore became an asset of the Estate.

69. The Trustee and the Government continued negotiating Tadlock's Certified Claim, without success.

70. On September 12, 2002, the Government served upon Tadlock's counsel a "Unilateral Modification" of the Contract, notifying Tadlock of the Government's formal Notice of Unilateral Determination, purported to be the Government's prerogative under FAR Regulation 49.109-7. This Unilateral Modification claimed that the Government had incurred the gross amount of $973,369.10 in liability to Tadlock, of which $927,064.10 had been paid, leaving a total of $46,305.00 owed by the Government to Tadlock.

71. The Trustee disagrees with and disputes the Government's calculation of liability as set forth in the Government's Unilateral Modification.

72. On July 28, 2003, counsel for the Trustee resubmitted a Request for Contracting Officer's Final Decision concerning Tadlock's Claim, again in accordance with the Dispute Clause of the

Contract and the Contract Dispute Act of 1978 as amended.

**FIRST CLAIM FOR RELIEF:**

**BREACH OF CONTRACT**

73. The Government's failure to respond to the Request for Contracting Officer's Final Decision within sixty days of service of that Request deems the Request denied and thus effectively exhausts the administrative remedies available to the Trustee, enabling the Trustee to bring this action.

74. The Contract as amended constituted a written contract, whereby the Government was obligated to pay to Tadlock, and became obligated to pay to the Trustee, the minimum amount of $4,933,379.00 (the final amount agreed upon by Tadlock and the Government in Modification to Contract No. A00013 executed by Tadlock and the Government on October 13, 1998), in exchange for Tadlock completing the renovations on Buildings 22206 and 22207 at Camp Pendleton, California, pursuant to the Plans and Specifications issued for the Project and to the various modifications enumerated in Modifications Number A00001 through A00013, as described above.

75. Pursuant to the FAR, Tadlock validly submitted its Certified Claim in the amount of $598,273.49, for which amount the Government is now liable to the Trustee with interest.

76. Service upon Tadlock of the Government's Termination for Convenience constituted a breach of the Contract by the Government.

77. The Government failed to pay Tadlock the full amount due to Tadlock under the Contract, thus causing Tadlock and now the Trustee to incur damages in the principal amount of $598,273.49, with interest calculated to the date of trial.

78. Tadlock fulfilled all its obligations under the Contract as amended, and complied with all conditions and agreements it was required to perform under the Contract, as amended, except those obligations, conditions and agreements from which Tadlock was excused by reason of the

Government's breach of the Contract through issuance of the Termination for Convenience.

79. As a direct result of the Government's breach of the Contract through service of its Termination for Convenience, Trustee as Trustee of the Estate has been damaged in the amount of $598,273.49, plus reimburseable costs and interest to be proven at trial.

**SECOND CLAIM FOR RELIEF:**

**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

80. Tadlock incorporates herein by reference the allegations set forth in paragraphs 1 through 14 above, as though fully set forth herein.

81.Every contract contains an implied covenant of good faith and fair dealing, in which each party to that contract promises to give full cooperation to the other party in its performance under the contract, and to refrain from doing any act which would prevent or impede the other party from receiving the full benefit of its agreement, and to refrain from any act that would prevent or impede the other party's' enjoyment of the fruits of that contract.

82. The Contract between Tadlock and the Government thus contained an implied covenant of good faith and fair dealing, in which the Government promised to give full cooperation to Tadlock in its performance under the Contract, and to refrain from doing any act which would prevent or impede Tadlock from receiving the full benefit of the Government's agreement with Tadlock, and to refrain from any act that would prevent or impede Tadlock's enjoyment of the fruits of the Contract. This covenant of good faith and fair dealing required the Government to fairly, honestly and reasonably perform the terms and conditions of its Contract with Tadlock.

83. The Government's failure to effectively and responsibly perform its obligations under the Contract with Tadlock was and is wrongful, in bad faith, and unfair, and therefore in breach of this covenant because Tadlock relied upon the Government' full and responsible performance when Tadlock entered into their Contract with the Government.

84. Based on information and belief, the Trustee alleges that the Government wilfully breached the Contract with Tadlock to force Tadlock into bankruptcy, thus enabling the Government to avoid performance of its obligations to Tadlock under the Contract.

85. As a direct, foreseeable and proximate result of the Government' breach of the covenant of good faith and fair dealing, the Trustee as trustee of the Estate has suffered and continues to suffer substantial monetary losses, damages and loss of other benefits as alleged above, all to the Estate's d amage, and to the detriment of the creditors of the Estate, the precise amount of which will be proven at trial.

**PLAINTIFF'S DEMANDS**

WHEREFORE, by reason of the foregoing, the Trustee demands judgment as follows:

a. Finding that the Government breached the Contract with Tadlock, thereby causing damages to the Estate;

b. Finding that the Government breached the implied covenant of good faith and fair dealing within the Contract, thus causing damages to the Estate;

c. Awarding the Trustee compensatory damages of $598,273.49 with interest calculated to the date of trial, according to proof at trial;

d. Awarding the Trustee costs allowed under Rule 54(d) of the Rules of this Court; and

e. For such other and further relief as the court deems appropriate.

Dated: July 7, 2004

By: ______________________

SPARBER RUDOLPH ANNEN, APLC
Richard J. Annen, Esq.
701 "B" Street, Suite 1000
San Diego, CA 92101-8109
Telephone: (619) 239-3600
Facsimile: (619) 239-5601

Attorneys for Plaintiff Leslie T. Gladstone, As Trustee
of the William G. Tadlock, Inc. Bankruptcy Estate